IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

JANE DOE,

                                                     CASE NO.:

        Plaintiff,

v.

ENSEMBLE RCM LLC, d/b/a
ENSEMBLE HEALTH PARTNERS,

        Defendant.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, JANE DOE (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby files this lawsuit against Defendant, ENSEMBLE RCM LLC d/b/a ENSEMBLE HEALTH PARTNERS (hereinafter referred to as "Defendant" or "Ensemble"), and alleges as follows:

**INTRODUCTION**

1. This is an action for race discrimination, retaliation, hostile work environment, and constructive discharge arising from Plaintiff's employment with Defendant Ensemble RCM, LLC, d/b/a Ensemble Health Partners ("Ensemble"). Ensemble hired Plaintiff, an African American woman, in February 2023 as an Accounts Receivable Manager. Over the course of more than two years, Ensemble systematically denied Plaintiff the training, staffing authority, advancement opportunities, and operational support that it freely provided to her white counterpart in the same role, under the same supervisor, in the same department. When Plaintiff reported this treatment to Human Resources and senior leadership, Ensemble did not remedy the discrimination. Instead, the retaliation escalated. Senior leaders intimidated Plaintiff, stripped her of managerial authority,

burdened her with additional workload, and ultimately passed her over for a Director promotion in favor of a less-qualified white external candidate.

2.      The workplace stress caused by this sustained mistreatment resulted in Plaintiff's hospitalization for a serious cardiac condition requiring surgical intervention. When Plaintiff returned from medical leave, she found that no one had maintained her work and that management immediately pressured her to catch up. Having exhausted every internal avenue for relief and facing conditions no reasonable employee could be expected to endure, Plaintiff resigned. This action seeks to hold Ensemble accountable for its unlawful conduct.

**PARTIES**

3.      Plaintiff is an African American female who resides in the State of Florida and proceeds in this action under a pseudonym to protect her safety. Plaintiff is a certified participant in the Florida Address Confidentiality Program pursuant to Florida Statutes §§ 741.401–741.465. Plaintiff's substitute mailing address, designated by the Florida Attorney General, is 723 Truman Avenue, Tallahassee, Florida 32314. Plaintiff's true identity is known to undersigned counsel and will be disclosed to Defendant's counsel pursuant to the protective order sought concurrently herewith. A Motion for Leave to Proceed Under Pseudonym is filed simultaneously with this Complaint.

4.      Defendant Ensemble RCM, LLC, d/b/a Ensemble Health Partners, is a limited liability company organized under the laws of the State of Delaware, registered to do business in the State of Florida as a foreign limited liability company, with its principal place of business at 11511 Reed Hartman Highway, Cincinnati, Ohio 45241. Defendant's registered agent for service of process in the State of Florida is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324. At all times material hereto, Defendant was an "employer" within the

2

meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), the Family and Medical Leave Act, 29 U.S.C. § 2611(4), and the Florida Civil Rights Act, Florida Statutes § 760.02(7). Defendant employs in excess of 10,000 employees and conducts business throughout the State of Florida, including employing remote workers in Florida.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to the concurrent jurisdiction afforded to state courts over claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. This Court has original jurisdiction over Plaintiff's claims under the Florida Civil Rights Act, Florida Statutes § 760.01 et seq.

6.      Venue is proper in Marion County pursuant to Florida Statutes § 47.051.

## ADMINISTRATIVE PREREQUISITES

7.      Plaintiff has complied with all statutory prerequisites in order to file this action.

8.      Plaintiff timely filed a Charge of Discrimination against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

9.      The EEOC issued Plaintiff's Notice of Right to Sue against Defendant.

10.      Plaintiff is timely commencing this action within ninety (90) days of receipt of her EEOC Notice of Right to Sue.

## FACTUAL ALLEGATIONS

11.      On or about February 21, 2023, Defendant hired Plaintiff as a Manager of Accounts Receivable. Plaintiff worked remotely from the State of Florida.

3

12. At all times relevant hereto, Plaintiff is an African American female with extensive experience in healthcare revenue cycle management. Plaintiff holds a Master's degree and CRCR certification.

13. Plaintiff's initial direct supervisor was Kristen Smith, Director. Above Kristen Smith was Ardenia Kane, Senior Director. Both are white.

14. Beginning in approximately March 2023, Ardenia Kane interfered with and disrupted Plaintiff's training, including assigning Plaintiff a project with explicit instructions to complete it entirely alone without any assistance or guidance. Defendant did not subject similarly situated white employees to this treatment.

15. In approximately April 2023, following the passing of Plaintiff's father, Plaintiff's supervisor Kristen Smith approved Plaintiff's request to leave work early to visit his gravesite. Ardenia Kane overrode this approval, telling Plaintiff she could not leave until her adjustments were completed, and called a meeting fifteen minutes before Plaintiff's scheduled departure. White members of the leadership team routinely left early for personal reasons, including dance recitals, volleyball, and golf lessons, without similar restrictions.

16. In approximately June or July 2023, Plaintiff reported to Human Resources representative Marie Eberle that she was experiencing workplace harassment from Ardenia Kane, including contradictory instructions between her direct supervisor and Ardenia Kane and public belittling in front of Plaintiff's team. Vice President Michael Bartlett was present during this report.

17. Despite these obstacles, Plaintiff received a strong 90-day performance review from her supervisor, Kristen Smith. Plaintiff routinely worked eleven to twelve-hour days, frequently without breaks.

18.    At all times relevant hereto, Plaintiff's primary comparator was Travis Cordell, a white male who held the identical title of Accounts Receivable Manager and reported to the same supervisor. Ensemble promoted Travis Cordell from Supervisor to Manager in approximately six months, bypassing Defendant's own standard operating procedure timelines.

19.    Beginning in approximately mid-2024, when Director Wesley White (white) became Plaintiff's direct supervisor following Kristen Smith's transfer, Plaintiff experienced pervasive and systematic differential treatment compared to Travis Cordell, including but not limited to the following:

  a. Wesley White denied Plaintiff access to training opportunities, including PowerBI and Directors-and-Above reporting, that he provided to Travis Cordell;

  b. Wesley White required Plaintiff to seek his permission before communicating with leaders on Travis Cordell's team, while Travis Cordell communicated directly with Plaintiff's team members without any such restriction;

  c. Wesley White denied Plaintiff the ability to hire or backfill positions on her team, while permitting Travis Cordell to hire both internally and externally and to grow his team to twenty employees;

  d. Wesley White denied Plaintiff access to training from subject matter experts that he made available to white employees on Plaintiff's team;

  e. During high-level client meetings, including Sentara Side-by-Side meetings, Wesley White provided significant support to Travis Cordell, including assisting him in presenting, while leaving Plaintiff to present alone without any guidance or preparation despite her repeated requests.

20.    Wesley White also undermined Plaintiff's managerial authority in ways unrelated to the Travis Cordell comparison. Wesley White invited Plaintiff's white subordinate, Stacy H., to a Managers-and-Above meeting without Plaintiff's knowledge or authorization. Wesley White instructed Plaintiff to change her subordinate Stacy H.'s performance evaluation from "Not Meeting Expectations" to "Meeting Some Expectations" despite extensive Workday documentation supporting Plaintiff's original assessment.

21.    Wesley White transferred an underperforming employee to Plaintiff's team, describing the individual as a "superstar," despite having previously told Plaintiff her team was overstaffed. The employee had no relevant experience.

22.    Wesley White warned Plaintiff that she was "not allowed to drop one ball" or make any mistakes.

23.    Between approximately June 2023 and March 2025, Plaintiff made multiple complaints of race discrimination and differential treatment to Human Resources, including to Marie Eberle, Paige Veta, and Payton Miller, and to senior leadership, including AVP Stephanie Daniels, SVP Tanya Robbins, and Senior Director Bonnie Roberds.

24.    Plaintiff's complaints specifically identified that she believed she was being subjected to prejudicial treatment based on her race compared to her white counterpart, Travis Cordell.

25.    Despite Plaintiff's repeated complaints, Defendant failed to take meaningful corrective action. The discriminatory and retaliatory conduct continued and escalated after each complaint.

26.    Upon information and belief, Senior Director Bonnie Roberds asked a fellow African American employee in writing whether Travis Cordell and Wesley White "were racist."

6

The employee responded in detail describing differential treatment of white employees over minorities. Bonnie Roberds did not respond and took no corrective action. Defendant was thus on notice that its supervisors were engaging in racially discriminatory conduct affecting Plaintiff and other Black employees, yet Defendant failed to act.

27.    Beginning in approximately July 2024, Plaintiff applied for at least four internal positions, including Director and Manager roles. Defendant granted Plaintiff only one interview and did not select her for any position.

28.    Wesley White acknowledged to Plaintiff that she was already performing many Director-level duties.

29.    In approximately May 2025, Ensemble promoted Wesley White to Director II, Operational Assessment, creating a vacancy for the Director of Accounts Receivable position. Plaintiff applied for the position.

30.    On or about June 17, 2025, Bonnie Roberds, AVP Heather Neill, and a third individual interviewed Plaintiff for the Director position. During the interview, neither Bonnie Roberds nor Heather Neill discussed the responsibilities or expectations of the Director role. Instead, they used the interview to question Plaintiff about concerns she had previously raised with Human Resources and senior leadership.

31.    In or about July 2025, Defendant hired Jessica Burton, a white female and external candidate, for the Director of Accounts Receivable position. Ms. Burton held the same title as Plaintiff (Manager) at her prior employer, and unlike Plaintiff, had no prior experience working with Defendant's client or systems. Plaintiff, by contrast, had been performing Director-level duties for Defendant for over two years and had received acknowledgment from her supervisor that she was already functioning at that level.

32.     In or about January 2024, Plaintiff terminated a subordinate employee, Shane Neaves, a white male, for performance-related reasons including insubordination and failure to complete assigned duties.

33.     In or about December 2025, Plaintiff learned that Ensemble had rehired Shane Neaves under Travis Cordell, with a start date of January 27, 2026. Upon information and belief, Mr. Neaves intentionally performed poorly on his interview because he knew Ensemble would hire him regardless.

34.     On or about April 8, 2025, Plaintiff experienced severe cardiac tachycardia while at work as a result of workplace stress. Plaintiff called an ambulance. Emergency personnel transported her to the hospital and admitted her near the Intensive Care Unit. Plaintiff subsequently underwent a cardiac ablation procedure.

35.     Plaintiff took leave under the Family and Medical Leave Act. Upon Plaintiff's return from FMLA leave in approximately late April 2025, Plaintiff discovered that Defendant had left her work undone during her absence, including failing to update required reports. Wesley White instructed Plaintiff to update these reports immediately.

36.     The stress of returning to work under these conditions caused Plaintiff's physician to place her back on FMLA leave.

37.     On or about July 9, 2025, Plaintiff submitted her resignation, effective July 10, 2025. In her resignation letter, Plaintiff stated that she was resigning due to "persistent challenges and lack of support from my leaders," "opposition, biased treatment, and numerous barriers," and the failure to foster "a sense of belonging, personal growth, or equal opportunities compared to my counterpart, Travis Cordell."

8

38.     Plaintiff's resignation was not voluntary. The cumulative effect of Defendant's discriminatory and retaliatory conduct over more than two years (including training exclusion, authority undermining, public belittlement, forced alteration of performance evaluations, intimidation by senior leadership, denial of advancement despite performing Director-level duties, hospitalization caused by workplace stress, and the hiring of a less-qualified white external candidate over Plaintiff) created working conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

39.     In or about December 2025, Plaintiff applied for Director and Manager positions at Ensemble. Despite her qualifications, prior experience, and history as an internal employee, Defendant denied Plaintiff all positions and did not offer her an interview for any role.

### COUNT I
### 42 U.S.C. § 2000e-2
### *Title VII Race Discrimination*

40.     Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

41.      Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race. 42 U.S.C. § 2000e-2(a)(1).

42.     Plaintiff, an African American, is a member of a protected class.

43.     Plaintiff was qualified for her position and performed her job well. Plaintiff received a strong 90-day performance review, routinely worked eleven to twelve-hour days, and her own supervisor acknowledged that she was performing Director-level duties.

9

44.    Defendant treated Plaintiff less favorably than her similarly situated white comparator, Travis Cordell, who held the identical title, reported to the same supervisor, and worked in the same department.

45.    Specifically, Defendant denied Plaintiff access to training opportunities it provided to Travis Cordell, including PowerBI and Directors-and-Above reporting.

46.    Defendant required Plaintiff to seek permission before communicating with other leaders while imposing no such restriction on Travis Cordell.

47.    Defendant denied Plaintiff the ability to hire or backfill positions on her team while permitting Travis Cordell to hire freely and grow his team to twenty employees.

48.    During high-level client meetings, Defendant's Director provided significant support to Travis Cordell while leaving Plaintiff to present alone without guidance despite her repeated requests for preparation assistance.

49.    Defendant further discriminated against Plaintiff by undermining her managerial authority, including instructing her to change a subordinate's performance evaluation from "Not Meeting Expectations" to "Meeting Some Expectations" over Plaintiff's documented objections, denying Plaintiff the ability to place a chronically underperforming subordinate on a performance improvement plan, and transferring an underperforming employee onto Plaintiff's team under the guise that the employee was a "superstar."

50.    Defendant failed to promote Plaintiff despite her superior qualifications and years of performing Director-level duties. Plaintiff applied for at least four internal positions beginning in July 2024 and Defendant granted her only one interview.

51.    Defendant ultimately hired a less-qualified white external candidate for the Director of Accounts Receivable position (a candidate who held the same Manager title as Plaintiff and had

10

no experience with Defendant's client or systems) while Plaintiff had performed Director-level duties for over two years.

52. Defendant's conduct forced Plaintiff into constructive discharge. The cumulative effect of Defendant's discriminatory actions over more than two years created working conditions so intolerable that no reasonable employee would have remained.

53. Defendant's articulated reasons for its employment decisions were pretextual. The true reason for Defendant's adverse actions was Plaintiff's race.

54. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, loss of enjoyment of life, and physical harm including a cardiac condition requiring hospitalization and surgical intervention

## COUNT II
### 42 U.S.C. § 2000e-3(a)
### *Title VII Retaliation*

55. Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

56. Title VII prohibits an employer from discriminating against any employee because she has opposed any practice made unlawful by Title VII or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a).

57. Plaintiff engaged in protected activity on multiple occasions. In approximately June or July 2023, Plaintiff reported race-based harassment to Human Resources representative Marie Eberle.

11

58.     In approximately July 2024, Plaintiff raised concerns about differential treatment with HR representative Paige Veta.

59.     In approximately fall 2024, Plaintiff complained to AVP Stephanie Daniels that she believed Wesley White was treating her with prejudice based on her race compared to her white counterpart.

60.     In approximately December 2024, Plaintiff escalated her complaints to SVP Tanya Robbins.

61.     In approximately March 2025, Plaintiff reported ongoing discriminatory treatment to HR representative Payton Miller and to Senior Director Bonnie Roberds.

62.     Following each instance of protected activity, Defendant took adverse employment actions against Plaintiff. After Plaintiff complained to Stephanie Daniels, the differential treatment between Plaintiff and Travis Cordell continued unabated.

63.     After Plaintiff complained to Tanya Robbins in December 2024, Wesley White added two senior leaders to a follow-up meeting in an attempt to intimidate Plaintiff, and Tanya Robbins instructed Plaintiff to change her subordinate's performance evaluation despite agreeing that managers should not be asked to do so.

64.     After Plaintiff's complaint resulted in the approval of a staffing transfer in February 2025, Wesley White immediately transferred an underperforming employee to Plaintiff's team and warned Plaintiff she was "not allowed to drop one ball." After Plaintiff raised concerns to Bonnie Roberds in March 2025, Roberds became defensive and told Plaintiff to "blame me."

65.     Defendant used Plaintiff's Director interview on June 17, 2025 to question Plaintiff about concerns she had previously raised with Human Resources and senior leadership, rather than

12

to evaluate her qualifications for the position. Defendant then hired a less-qualified white external candidate for the role.

66.    After Plaintiff resigned, Defendant continued to retaliate. When Plaintiff reapplied for Director and Manager positions in December 2025, Defendant denied her all positions without granting a single interview. Defendant also rehired Shane Neaves, a white male whom Plaintiff had previously terminated for cause, under Plaintiff's former counterpart Travis Cordell.

67.    The temporal proximity between Plaintiff's protected activities and the adverse actions, the escalating pattern of retaliation following each complaint, and Defendant's use of Plaintiff's own complaints as the basis for her Director interview demonstrate a clear causal connection between Plaintiff's protected activity and Defendant's adverse actions.

68.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, loss of enjoyment of life, and physical harm.

### COUNT III
### 42 U.S.C. § 2000e-2
### *Title VII Hostile Work Environment*

69.    Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

70.    Defendant subjected Plaintiff to unwelcome conduct based on her race that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

71.    The conduct Plaintiff experienced was unwelcome. Plaintiff repeatedly complained about the treatment to Human Resources and senior leadership, demonstrating that she did not welcome or invite it.

13

72.     The conduct was based on Plaintiff's race. Defendant's white comparator, Travis Cordell, did not experience similar treatment.

73.     Defendant provided Travis Cordell with training, staffing resources, meeting support, and communication freedom that it systematically denied to Plaintiff. Defendant's own Senior Director asked a fellow African American employee in writing whether Travis Cordell and Wesley White "were racist," confirming that the racial dimension of the conduct was recognized within Defendant's own leadership.

74.     The conduct was both severe and pervasive. Beginning in March 2023 and continuing through Plaintiff's resignation in July 2025, Defendant's supervisors and senior leaders: publicly belittled Plaintiff in front of her team; denied Plaintiff leave to visit her deceased father's gravesite while permitting white leaders to leave early for personal activities; assigned Plaintiff projects with instructions to complete them alone without guidance; excluded Plaintiff from training opportunities provided to white employees; denied Plaintiff the authority to hire, discipline, or evaluate her own subordinates; denied Plaintiff preparation assistance for high-level client meetings while actively supporting her white counterpart; transferred underperforming employees onto Plaintiff's team; warned Plaintiff she was "not allowed to drop one ball"; used a Director interview to interrogate Plaintiff about her prior discrimination complaints; and hired a less-qualified white external candidate for the Director position Plaintiff sought.

75.     The harassment altered the conditions of Plaintiff's employment. The workplace stress directly caused Plaintiff to experience severe cardiac tachycardia requiring emergency hospitalization and a cardiac ablation procedure. Plaintiff's physician placed her on FMLA leave a second time because the stress of returning to work under these conditions endangered her health.

14

76.    Defendant knew of the hostile environment and failed to remedy it. Plaintiff made at least five formal complaints to Human Resources representatives Marie Eberle, Paige Veta, and Payton Miller, and to senior leaders Stephanie Daniels, Tanya Robbins, and Bonnie Roberds, between June 2023 and March 2025. Despite this notice, Defendant took no meaningful corrective action. The discriminatory conduct continued and escalated after each complaint.

77.    As a direct and proximate result of Defendant's failure to prevent and remedy the hostile work environment, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, loss of enjoyment of life, and physical harm including a cardiac condition requiring hospitalization and surgical intervention.

### COUNT IV
### 42 U.S.C. § 1981
### *Race Discrimination*

78.    Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

79.    Section 1981 provides that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens. 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

80.    Defendant intentionally discriminated against Plaintiff on the basis of her race in the performance, modification, and termination of her employment contract.

81.    Defendant denied Plaintiff training, staffing authority, promotional opportunities, and operational support that it provided to her white counterpart in the same position.

15

82.    Defendant undermined Plaintiff's managerial authority by overriding her performance evaluations and staffing decisions.

83.    Defendant passed Plaintiff over for promotion in favor of a less-qualified white external candidate despite acknowledging that Plaintiff was already performing Director-level duties.

84.    Defendant's discriminatory conduct ultimately forced Plaintiff's constructive discharge.

85.    Defendant's discriminatory intent is demonstrated by the systematic and pervasive nature of the differential treatment, the sustained pattern of denying Plaintiff resources and opportunities afforded to her white counterpart, Defendant's failure to act despite its own leadership's written acknowledgment that the conduct may have been racially motivated, and the use of Plaintiff's discrimination complaints as the basis for her Director interview rather than evaluating her qualifications.

86.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, loss of enjoyment of life, and physical harm. Plaintiff seeks compensatory and punitive damages without limitation under § 1981.

**COUNT V**
**42 U.S.C. § 1981**
**Retaliation**

87.    Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

88.    Section 1981 protects individuals who oppose racial discrimination from retaliation.

16

89.     Plaintiff engaged in protected activity by opposing Defendant's racially discriminatory practices through multiple internal complaints identifying race-based differential treatment between approximately June 2023 and March 2025, and by filing a Charge of Discrimination with the EEOC on January 13, 2026.

90.     Defendant retaliated against Plaintiff for opposing racial discrimination by escalating the discriminatory treatment after each complaint, intimidating Plaintiff through senior leadership, using Plaintiff's Director interview to interrogate her about her prior complaints, hiring a less-qualified white external candidate over Plaintiff for the Director position, and denying Plaintiff all positions without interview when she reapplied after her resignation. The retaliatory conduct contributed to Plaintiff's constructive discharge.

91.     As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, loss of enjoyment of life, and physical harm. Plaintiff seeks compensatory and punitive damages without limitation under § 1981.

## COUNT VI
### 29 U.S.C. § 2615(a)(1)
### *FMLA Interference*

92.     Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

93.     The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1).

17

94.     Plaintiff was an eligible employee under the FMLA. Defendant employed more than fifty employees, Plaintiff had been employed by Defendant for more than twelve months, and Plaintiff had worked more than 1,250 hours during the twelve-month period preceding her leave.

95.     Plaintiff suffered from a serious health condition. On April 8, 2025, Plaintiff experienced severe cardiac tachycardia at work, requiring emergency hospitalization near the Intensive Care Unit and a cardiac ablation procedure.

96.     Plaintiff exercised her right to FMLA leave and Defendant approved the leave.

97.     Upon Plaintiff's return from FMLA leave, Defendant interfered with Plaintiff's right to reinstatement by failing to maintain Plaintiff's work during her absence, including failing to update required reports that Plaintiff was responsible for.

98.     Wesley White immediately demanded that Plaintiff complete all outstanding work, creating conditions so stressful that Plaintiff's physician placed her back on FMLA leave.

99.     Defendant's failure to maintain Plaintiff's duties during her absence and its demand for immediate completion upon return effectively penalized Plaintiff for exercising her FMLA rights and interfered with her right to return to equivalent working conditions.

100.     As a direct and proximate result of Defendant's unlawful interference with Plaintiff's FMLA rights, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, and physical harm.

## COUNT VII
### 29 U.S.C. § 2615(a)(2)
### *FMLA Retaliation*

101.     Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

18

102.    The FMLA makes it unlawful for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the FMLA or for exercising rights under the FMLA. 29 U.S.C. § 2615(a)(2).

103.    Plaintiff exercised her FMLA rights by taking approved medical leave following her hospitalization for cardiac tachycardia in April 2025.

104.    Following Plaintiff's exercise of her FMLA rights, Defendant took adverse employment actions against Plaintiff.

105.    Defendant failed to maintain Plaintiff's work during her absence. Upon Plaintiff's return, Wesley White immediately demanded that Plaintiff complete all outstanding work.

106.    The stress caused Plaintiff's physician to place her back on FMLA leave.

107.    After Plaintiff's second FMLA leave, Defendant continued the pattern of hostile and discriminatory treatment, including conducting a sham Director interview and hiring a less-qualified white external candidate for the position, contributing to Plaintiff's constructive discharge approximately two months after her return from FMLA leave.

108.    The temporal proximity between Plaintiff's FMLA leave and the adverse actions, combined with the escalating hostility upon her return, demonstrate a causal connection between Plaintiff's exercise of FMLA rights and Defendant's adverse actions.

109.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, and physical harm.

## COUNT VIII
### Fla. Stat. § 760.10
### *FCRA Race Discrimination*

110.    Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

111.    The Florida Civil Rights Act makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race. Fla. Stat. § 760.10(1)(a).

112.    As set forth in detail above, Defendant discriminated against Plaintiff on the basis of her race by denying her training, staffing authority, and advancement opportunities provided to her white counterpart; undermining her managerial authority; passing her over for promotion in favor of a less-qualified white external candidate; and forcing her constructive discharge through an accumulation of intolerable discriminatory working conditions. These acts constitute unlawful employment practices under the FCRA.

113.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

## COUNT IX
### Fla. Stat. § 760.10
### *FCRA Retaliation*

114.    Plaintiff reincorporates the factual allegations in Paragraphs 1 through 39 as if fully set forth herein.

115.    The Florida Civil Rights Act makes it an unlawful employment practice for an employer to discriminate against any person because that person has opposed any practice which

is an unlawful employment practice under the FCRA or because that person has made a charge or participated in any manner in an investigation, proceeding, or hearing under the FCRA. Fla. Stat. § 760.10(7).

116.    Plaintiff engaged in protected activity by making multiple internal complaints of race discrimination between June 2023 and March 2025, and by filing a charge with the EEOC and the Florida Commission on Human Relations on January 13, 2026.

117.    Following Plaintiff's protected activity, Defendant escalated its discriminatory treatment, intimidated Plaintiff through senior leadership, used Plaintiff's Director interview to question her about prior complaints, hired a less-qualified white external candidate over Plaintiff, denied Plaintiff all post-resignation applications without interview, and created conditions forcing Plaintiff's constructive discharge. These acts constitute unlawful retaliation under the FCRA.

118.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendant for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, statutory damages, compensatory damages, emotional distress damages, punitive damages, equitable relief, interest, attorney's fees and costs, disbursement of this action, injunctive relief, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of federal and Florida law.

21

Dated:  April 20, 2026

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

/s/ *Nicolas A. Yoda*
Nicolas A. Yoda, Esq.
Florida Bar No.: 1015597
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Nicolasy@dereksmithlaw.com

22